H. F. Rodenkirk for use of Louis Deitenbach, Appellant, v. State Farm Mutual Automobile Insurance Company, Appellee.

Gen. No. 42,622.

422

Heard in the third division of this court for the first district at the April term, 1943. Opinion filed March 21, 1945. Released for publication April 10, 1945.

W. A. LEOPOLD and FRIEDBERG & BUBLICK, all of Chicago, for appellant.

GARDNER, CARTON & DOUGLAS, of Chicago, for appellee; ERWIN W. ROEMER and JAMES A. VELDE, both of Chicago, of counsel.

MR. JUSTICE LUPE delivered the opinion of the court.

This was an action in garnishment brought by Hilary F. Rodenkirk for the use of Louis Deitenbach,

to recover from State Farm Mutual Automobile Insurance Company, a corporation, as garnishee, the amount of a judgment rendered in favor of Louis Deitenbach against Hilary F. Rodenkirk, in the superior court of Cook county. The matter was heard upon the issues joined on interrogatories, the answers thereto, and the replication to the answers. On November 10, 1942, after hearing of evidence the court entered its order discharging the garnishee, and entered judgment thereon, from which judgment plaintiff brings this appeal.

The defendant Hilary F. Rodenkirk, as owner of a Chevrolet automobile, obtained an insurance policy from State Farm Mutual Automobile Insurance Company, a corporation, the garnishee, which provided protection from liability for accidents while driving his own car and, also, protection from liability while driving any other private passenger automobile, with certain exceptions, which will be hereinafter discussed.

On July 20, 1941, he, while driving a 1936 Dodge automobile owned by one John Meyer, caused personal injuries and damages to plaintiff. Plaintiff sued on May 20, 1942, and a judgment was entered against the defendant in the sum of $10,000. An execution was issued and returned by the sheriff "No property found and no part satisfied." On June 7, 1942, an affidavit of garnishment was filed naming State Farm Mutual Automobile Insurance Company, a corporation, as garnishee. In answer to interrogatories filed inquiring of garnishee of his indebtedness to defendant and whether the garnishee had issued an insurance policy to defendant (a copy of which policy was attached to the interrogatories), and if said policy was in force on July 20, 1941, garnishee denied indebtedness, admitted the issuance of the policy in question and that said policy was in force on July 20, 1941, but alleged further that the policy did not apply to the automobile which defendant Rodenkirk was operating

on July 20, 1941, as said automobile had been furnished for defendant's regular use, and for the regular use of a member of defendant's household. A replication was filed thereto, alleging that the garnishee had not truly discovered the credit due from it to defendant, and further alleged that the automobile involved in the accident had not been furnished for the regular use of defendant or of any member of his household.

At the time of the hearing in the garnishment proceedings, it was agreed that the sole question to be determined was: Was the automobile that Rodenkirk was operating at the time of the accident hired by him as a part of a frequent use of hired automobiles, or was the same furnished to him for his regular use or for the regular use of a member of his household? The trial court found the auto operated by defendant at the time of the occurrence was furnished to him for his regular use or for the regular use of a member of his household.

The policy in question contained the following clause:

IV. *Drive Other Private Passenger Automobiles.*

Such insurance as is afforded by this policy for bodily injury liability and for property damage liability applies:

(1) to the named insured, if an individual and the owner of the automobile classified as "pleasure and business" or if husband and wife either or both of whom own such automobile, and

(2) to the spouse of such individual if a resident of the same household and to the employer of such named insured, as insured, with respect to the operation of any other private passenger automobile by such named insured or spouse or by a private chauffeur or domestic servant in the employ of such named insured or spouse and with respect to the presence of such named insured or spouse in any other private passenger automobile.

The provisions of this paragraph do not apply:
(a) To any automobile
    (1) owned in full or in part by or registered in the name of the named insured or any member of the household thereof, other than a private chauffeur or domestic servant employed in connection therewith, or
    (2) hired as part of a frequent use of hired automobiles by or furnished for regular use to the named insured, a member of the household thereof, or a private chauffeur or domestic servant employed in connection therewith; nor, with respect to such employer, to any automobile owned in full or in part by him or registered in his name or hired by him as part of a frequent use of hired automobiles;
(b) To any insured other than as defined in this paragraph;
(c) Under the conditions stated in divisions (a), (b) and (c) of Paragraph III.

The questions thus presented for determination are: Do the provisions of clause IV, ''Drive Other Private Passenger Automobiles,'' give to Rodenkirk the right of recovery against garnishee under the terms of the policy, and had the defendant or a member of his household been furnished the regular use of the automobile which defendant had been operating at the time of the accident? If the automobile which Rodenkirk was operating at the time of the accident was hired by him as a part of a frequent use of hired automobiles, or was furnished to him for his regular use, or for the regular use of a member of his household, plaintiff cannot recover—otherwise he should. To determine these questions it is necessary to examine the evidence.

Nondas Rodenkirk testified she was 27 years of age and lived with her sister in Wilmette for the past seven years; that Hilary Rodenkirk is her father and

resides in Des Plaines; and that she last lived with her father about eight years ago. She further testified that John Meyer, her fiance, before his entry into the Army on March 21, 1941, turned over to her his 1936 Dodge automobile; that at the time she received the car from him he told her "she could use the car"; that from March 21, 1941 up to the time the car ran out of oil and needed repairs, she alone used the car; that she brought the car to her father, who was in the garage or automobile body repair business, to repair the car. She, however, was unable to give the date or approximate date when she delivered the car to her father for repairs or state how long he had it, or the length of time the car was laid up. She further testified that there was one set of keys to the car and that she had them. She said she did not know at the time that her father had an accident with the car which occurred on July 20, 1941, but found out soon afterward. She said she saw the car after the accident; that it could not run, and that it was damaged. That no one had the use of the car but herself and that from March 21, 1941 to the present time no one drove it but herself; that during the time she was driving the car she bought gasoline for it, and that if she were home on a weekend (meaning at the home of her father) her father would get the oil for her because he could get it cheaper. On cross-examination she testified that when John Meyer was about to leave to go to the Army on March 21, 1941, he talked to her and her father; that John Meyer had been acquainted with her father for a number of years before that time; that Meyer said to her that he was "turning the automobile over for her use and for her father's use also," and that he said, "Here is the car Mickey. You take care of it and your dad will look after the car and take care of it for you if anything goes wrong with it. Your dad will take care of all that stuff; you don't have anything to worry about." In answer to the question, "And he

told your dad he could have the use of the car too, didn't he?" she replied, "Well, yes, he did." She further testified that she had some of her clothing in her father's home, that portion of her wearing apparel that she did not use during that time of the year; that she had often gone to the home of her father during the week-end. The question was asked the witness, "And you regarded your father's and mother's house as your home, didn't you?" She answered, "Well, my home, well, I don't know. It was in—I lived at Wilmette and my father's house was my house too. I don't know." The witness testified that she was not present at the time of the accident on July 20, 1941, and that she did not know that her father had used the car or that he had finished repairing it; that her father was using the car for his own business at the time; that her father did not ask her permission to use it that day; that it was the understanding between herself, her father, and John Meyer, that her father was to keep the car in repair; that she never paid her father for labor repairing the car but paid for parts used in such repairs. She identified her signature on Garnishee's Exhibit "1" marked for identification, and that said signature appeared on the first and second pages thereof.

Hilary F. Rodenkirk, called on behalf of plaintiff, testified that he resided at 738 Lee street, Des Plaines; that his daughter resided in Wilmette; that in response to a subpoena duces tecum he produced an insurance policy and receipts showing payment of the last premiums thereon; that he received the policy from the State Farm Mutual Automobile Insurance Company. He further testified that he owned a Chevrolet town sedan automobile on July 20, 1941, and that he had owned it since 1938; that he was on July 20, 1941 doing automobile body and fender work and was also employed by the Des Plaines Motor Sales, located at 1500 Miller street, Des Plaines; that he did

work in a separate shop about a block and a half from his home, and that he usually walked to work; that he is now with the Douglas Aircraft doing construction work; that he was involved in the accident on July 20, 1941, at which time he was driving a 1936 Dodge coupe owned by John Meyer, but he was unable to remember how long he had the car before the accident. He testified further that the car was brought to him by his daughter, Nondas, and needed repairs, that its bearings were out and certain body work had to be done on it, and the car was tied up for a couple of weeks. He testified he did not drive the car during that time excepting in and out of the shop; that he probably drove the car before his daughter brought it to him for repairs, he would not know how often, but used it to move from Rand Road to Des Plaines in June or July 1941; that he could not say on how many other occasions he had driven the car but did not use it much; on July 20, 1941 the car was damaged due to the accident in which he was involved; that he made the necessary repairs on the car, and it was tied up for a couple of months; that after the car had been repaired his daughter got it; from that time to the present he probably used the car to go to work or something turned up, only a couple of blocks. On cross-examination he testified that he did not recall if his daughter had paid him for any of the parts that he had put into the car while repairing it; that she said, "Go and fix it up and whatever it costs, I will reimburse you." He further testified that he did not know if the daughter had ever paid him any money for parts as it was a family matter and it was never checked that close; that he had known John Meyer seven or eight years and knew his family; that on July 20, 1941, he was driving Johnny Meyer's automobile, which was a 1936 Dodge coupe, on his own business or pleasure; that he did not ask anyone if he could use it. In answer to the question, "You had the

automobile in your possession then?'' he said ''It was at my house. It was ready for use and in good mechanical condition.'' He further testified that he had talked to John Meyer before he (John Meyer) went to the Army; that John Meyer advised him that he was going to leave the automobile with Nondas, the daughter of the witness, for her use; that it was an understanding that the witness could use it if he wanted to; and that Nondas told the witness that he could use it if he had any use of it, and that he did not recall Meyer telling him outright he could have any use of it, and that the only thing that Meyer said was, ''Take care of the car while it is in my daughter's possession.'' The witness further testified he used the car in June 1941 to move from Rand Road to Des Plaines; that he could not say how many times he used the car. The witness further testified that he told Matt Lear at the time of the taking of the statement marked Garnishee's Exhibit ''2'' for identification that John Meyer ''had turned over the keys'' to her (Nondas) but he said ''that I could use the car also if I needed it and that I should take care of it if there was any trouble.''

John J. Meyer, a witness called on behalf of defendant garnishee, testified that he is 27 years of age and a corporal in the United States Army; that prior to his induction into the Army he lived in Wilmette; he entered the Army on March 21, 1941, and at that time he owned a Dodge coupe, 1936 model; that he knew Nondas Rodenkirk and her father Hilary F. Rodenkirk for about seven years; that he had a conversation with Hilary F. Rodenkirk and Nondas with reference to the use of his automobile; that he had discussed it several times with Nondas and her parents; that about ten days before his leaving for the Army he talked to Nondas and her father about leaving his automobile and told them that they could use his car; that Mr. Rodenkirk was to keep it up and he could use the car

as he saw fit; and that he left the car with them under those conditions; that someone connected with the State Farm Mutual Automobile Insurance Company (defendant garnishee) got in touch with him in Phoenix and that he came to Chicago to testify. That he first learned that his car was involved in an accident in September 1941.

Hilary F. Rodenkirk, a witness previously called by plaintiff, was recalled on behalf of defendant, and identified his signature on Garnishee's Exhibits 2, 3, 4, 5 and 6. He testified that the statement Garnishee's Exhibit 5 was written out in his presence by Mr. Lear and that the witness signed it.

Thereupon, Garnishee's Exhibits 1, 2, 3, 4 and 5 were offered in evidence. Exhibit 1 was later withdrawn and Garnishee's Exhibits 2, 3, 4 and 5 were received.

Plaintiff contends by virtue of the judgment entered against Hilary F. Rodenkirk and by the terms of coverage in the policy of insurance, the defendant garnishee became liable to the defendant, and he urges the evidence clearly shows that the automobile which was operated by Rodenkirk at the time of the accident was not a motor vehicle that Rodenkirk had hired as part of a frequent use of hired automobiles by, or furnished for regular use to the insured or a member of his household; that the automobile operated by Rodenkirk at the time of the accident was operated by him incidentally and therefore, plaintiff contends, he should recover. Plaintiff further urges that the garnishee undertook to and did defend Rodenkirk in the original case of *Deitenbach v. Rodenkirk*, without adequate, proper or effective nonwaiver of rights, and that defendant garnishee is therefore estopped from denying liability under the policy.

Garnishee contends that it is not liable under the terms of the policy, as the evidence shows the automobile driven by defendant Rodenkirk at the time of

the accident had been furnished for his regular use and for the regular use of his daughter who is a member of his household, and it further contends that it is not estopped from denying liability under the terms of the policy.

In this garnishment proceeding plaintiff seeks to recover on behalf of defendant on defendant's alleged cause of action against the insurance company, the garnishee. The plaintiff stands in the shoes of the defendant in the original case and may recover only if the insured could have maintained an action against the insurance company. (*Jones v. Manufacturer's Casualty Ins. Co.*, 313 Ill. App. 386; *Schneider v. Autoist Mut. Ins. Co.*, 346 Ill. 137.) If the defendant or a member of his household had been furnished the regular use of Meyer's car, defendant was not covered by the policy at the time of the accident. If, however, the defendant or a member of his household had not been furnished the regular use of the Meyer car, plaintiff should recover. It was incumbent upon the plaintiff herein to prove by a preponderance of the evidence that neither the insured nor a member of his household was furnished the regular use of the car. The case of *Soukup v. Halmel*, 357 Ill. 576, was a garnishment proceeding wherein the plaintiff in a personal injury suit sought to recover from the insurer of defendant's car. The insurance company denied that there was coverage, on the ground that the insured's son, who was then operating the car, was acting without permission of the insured. It was contended by plaintiff that the burden of proof was on the insurance company, but the court said:

"The burden of proof rested upon plaintiff to establish that Anton (the assured's son) was covered by the policy. That burden was not shifted by the affirmative allegation in the answer that he was not covered. The denial raised the issue as to whether he

was covered, and not whether a liability existed under the policy because of an alleged breach.''

By the provisions of the insurance policy in question it specifically covered defendant's 1938 Chevrolet automobile. Clause IV, the clause in question, provided in some instances that the insurance applied to the driving of other automobiles either by the named insured or by his spouse or employee.

The exclusion from coverage of other cars owned by the insured as well as cars owned by the members of his household, and the exclusion of cars furnished for regular use to the insured or a member of his household would seem to indicate the intention of the company to protect itself from a situation where an insured could pay for one policy and be covered by the insurance in driving any car that he decided to use whether owned by him or members of his family, or cars that had been furnished for his regular use; in other words, cars under his control that he could use at will and might use often. Without some such exclusion it is obvious that the company might lose premiums and also that the hazard under the insurance would be increased. It is evident that the purpose on the part of the company in extending the driver's regular insurance without the payment of any additional premiums would apply to the occasional driving of cars other than his own, but would be inapplicable to an automobile furnished to the insured for his regular use.

The question then presents itself from the evidence: Was the Meyer automobile, which was being driven on July 20, 1941 by Hilary Rodenkirk, furnished to Rodenkirk for his regular use or the regular use of a member of his household. There can be little doubt that John Meyer turned his automobile over to Nondas Rodenkirk on March 21, 1941 and gave permission to her and her father Hilary Rodenkirk to use the car as they saw fit. This is borne out by the testimony of

John Meyer who testified (Rec. 111) in answer to a question, "Well, I told them they could use my car, put it in charge of Miss Rodenkirk. Her dad was to keep it up and he could use the car as he saw fit." Nondas Rodenkirk testified as to what was said at the time John Meyer turned the car over to her. In answer to the question: . "And he told your dad he could have the use of the car too, didn't he?" she said, "Well, yes, he did." H. F. Rodenkirk (who is indicated by the record to have been interested in the result of this garnishment proceeding by reason of a judgment against him for ten thousand dollars), testified that he had often used the car in question; that it was the understanding that he could use it whenever he wanted to; that Meyer told him to keep the car in good shape; that witness told Matt Lear at the time witness signed the document Exhibit 2 that John Meyer turned over the car to his daughter, that he (Hilary Rodenkirk) could use the car as he saw fit, and should take care of it if there was any trouble. In Garnishee's Exhibits numbers 2 and 4, under date November 8, 1941, upon which the witness (Rodenkirk) had identified his signature, he stated, "I had the regular use of the car that I was driving on July 20, 1941, in connection with my agreement with the owner to furnish grease, oil and keep it in repair." And in Garnishee's Exhibit number 6 under date May 20, 1942, he stated, "The automobile that was driven at the time of the occurrence was not owned by me but it was furnished for my regular use."

Plaintiff contends that the evidence shows only that Rodenkirk used the car on this one occasion and therefore plaintiff should recover. With that contention we cannot agree. The record shows that on many occasions since March 20, 1941, Rodenkirk used and operated the automobile in question. The matter for determination is not whether Rodenkirk used the auto-

mobile on one occasion but—Was he furnished the automobile for his regular use? If he was furnished the automobile for his regular use there could be no recovery under the policy.

This question presented is one of first impression in this state. The case of *Farm Bureau Mut. Automobile Ins. Co. v. Boecher*, reported in (Ohio App.) 48 N. E. (2d) 895, was one which involved the construction and application of a "drive other cars" clause similar to that of the policy here involved. Boecher, an employee of a motor company, while driving one of the company's cars, was covered by his wife's policy which contained a "drive other cars" clause. The car which Boecher was using at the time of the accident was one of a number of secondhand cars which was held by Boecher's employer for sale. The practice of salesmen, of which Boecher was one, was to take any available car either for demonstration purposes or making trips to and from their homes. Boecher had an accident while driving a car to his home. This car was a secondhand car which he had never used before. The insurance company brought an action for a declaratory judgment that the policy did not cover the accident. The lower court held for defendant but upon appeal the judgment was reversed and judgment entered for the insurance company, on the ground that Boecher had the regular use of the car in question. The court there said that the term "furnished for regular use" was not restricted to the extended or frequent use of the specific automobile insured by the rider in the policy of insurance. At page 895, the court said:

"In our judgment, there is but one substantial question presented by this appeal, namely, whether or not under the Drive Other Private Passenger Automobile endorsement on the policy the automobile which defendant Jasper M. Boecher was driving at the time

of the collision, out of which the claim against the plaintiff company arose, 'was furnished for regular use' to Jasper M. Boecher.

"The situation presented is novel. The automobile which defendant Boecher was driving at the time of the collision was owned by the Lynch Motor Car Company, the employer of Mr. Boecher. It was one of a number of cars owned by said Motor Car Company and held for sale as secondhand cars. Mr. Boecher and other salesmen for the company followed the practice of taking out any available car for the purpose of attempting to sell it. In following out this practice it is inferable that Boecher regularly, in the business of the company, used some automobile of said company which was held by them for sale. However, he had not operated the automobile which he was driving at the time of the collision, regularly. As a matter of fact he had not driven it at any time before the date of the collision.

"If the term 'furnished for regular use' as employed in the rider on the policy under consideration must be restricted to the extended or frequent use of the specific automobile insured by the rider, then, obviously, the car which Boecher was driving at the time of the collision was not furnished for regular use within the terms of the policy. [We doubt if such restricted construction is appropriate under the peculiar facts of this case.] Upon the record it is undisputed that any automobile of the number of used cars regularly on hand for sale could have been used by Boecher for demonstration purposes, and likewise he was permitted to use any of these automobiles in making trips to and from his home at night, especially if he wanted to determine its running condition. He says he drove a car home 'quite often.' This use was so frequent as to be termed regular use. The automobile which he was operating at the time of the collision was in the same category as any and all of the

other used automobiles. *He could have used it not only on the night he drove it to his home, but the next day or succeeding days, for demonstration purposes, or again and again to drive to his home. So that it must be said that this automobile was within the terms of the policy furnished for regular use to Boecher. We believe this would be true as to any automobile in the group of used cars, whether or not it was the first time that he was driving it, because, although he might not customarily or frequently drive any specific car in the group, each and all of these cars were furnished to him for his regular use, either in the business during the day or if he desired to drive home at night."* (Italics ours.)

Could there be any question that Rodenkirk, by virtue of his understanding with Meyer, could have used the car at any time, whenever he should desire? We think he could have used the car at any time after March 21, 1941, as Meyer, the owner of the car, told Rodenkirk that he was to keep the car up and could use it as he saw fit. Meyer's giving the car to Rodenkirk to use it as he saw fit would necessarily mean that the car was furnished to Rodenkirk for his regular use. The car was made available for the use of Rodenkirk, as was the car made available to the insured in the Boecher case above cited.

We have read the case of *Lumbermens Mut. Casualty Co. v. Pulsifer*, 41 F. Supp. 249, cited by plaintiff. The point at issue therein was whether or not Elton Pulsifer, whose car Louis Pulsifer, his father, the insured, was driving when the accident occurred, was a member of the household of his father as the term is used in the policy, and this is shown by the statement of the court of the matter in dispute, where the court said, at page 250:

"The dispute between the parties is settled by the answer to the question whether the son, Elton Pulsifer, whose car Louis Pulsifer, the insured, was driving

when the accident occurred, March 13, 1941, was at that time a 'member of the household' of his father, Louis Pulsifer, *as that term is used in the policy.* If he was, the insurance policy issued by the plaintiff does not cover the liability of Louis for the accident— otherwise it does.''

Counsel for plaintiff next contends the court erred in permitting defendant to impeach the testimony of defendant's witness Hilary F. Rodenkirk. The witness was called for the sole purpose of identifying his signature on certain statements and other exhibits signed by him. Any statement signed, or any admission made, on behalf of a party to a suit, may be shown as admissions against interest. They may also be received in evidence for the purpose of impeaching the testimony of the witness. The record shows that Rodenkirk was first called as a witness on behalf of the plaintiff and testified with reference to the use of the Meyer automobile. Defendant garnishee called Rodenkirk for the purpose of identifying his signature on the various exhibits. Rodenkirk was called by defendant garnishee for the purpose of proving the authenticity of the statements which would impeach his testimony previously given on behalf of plaintiff. Surely the statements were not offered or tendered to impeach the testimony of Rodenkirk as a witness on behalf of defendant. As we understand the rule, a witness may be asked as to whether or not he made certain statements orally, or, if he had signed certain written statements, papers or documents, which would impeach the testimony which he had previously given on behalf of the opposite party, and when a proper foundation is laid, are admissible in evidence, and may be used for the purpose of impeaching the testimony of the witness who gave such statements. We find no merit in plaintiff's contention.

Counsel for plaintiff maintains the insurer (garnishee) was estopped from denying liability under the policy. He bases this contention on the theory

that the insurance company had retained an attorney to defend the original suit brought by Deitenbach against Rodenkirk, and that it made an investigation of the accident to determine the question of its liability. The record discloses that Mr. Charles Green, who had filed his appearance for and on behalf of the defendant, Rodenkirk, was not acting for and on behalf of the insurance company. Hilary Rodenkirk, the defendant, signed the notice and acknowledgment of nonwaiver of rights (Garnishee's Exhibit number 3) on October 9, 1941. It was therein provided that it was understood between the State Farm Mutual Automobile Insurance Company and Rodenkirk that any action taken by the insurance company in investigating or attempting to adjust or defend any claim or in the handling of any litigation growing out of the accident involving Louis Deitenbach, which occurred on July 20, 1941, at Des Plaines, Illinois, shall not be construed as a waiver of the right of the insurance company to deny liability at any time under the policy which had been issued to Hilary Rodenkirk, and that it was further understood that the acknowledgment of the notice would be considered as a waiver of the rights under the policy. Garnishee's exhibit number 4 under date November 8, 1941, authorized said Charles E. Green to continue to defend the suit until Hilary F. Rodenkirk could make other arrangements. This direction was signed by Hilary F. Rodenkirk. Garnishee's exhibit number 6 contains a direction and authorization to attorney Charles E. Green by Hilary F. Rodenkirk to Green, as his attorney and not as the attorney for the State Farm Mutual Automobile Insurance Company, agreeing that a judgment be entered against said Hilary F. Rodenkirk in the sum of $10,000 in the event the wilful and wanton charges contained in Count 2 of the complaint be dismissed, and directs and authorizes said attorney, as his attorney, to consent that a judgment be entered in said court for said amount. Rodenkirk in said statement further stated

that he understood the State Farm Mutual Automobile Insurance Company would not in any manner be compelled to pay or be liable for said judgment; that it was his wish that said judgment be entered to avoid the consequences of a possible verdict finding or judgment against him on the charges of wilful and wanton conduct as contained in Count 2 of the complaint. He then reaffirmed the statements contained in the notice and acknowledgment of nonwaiver of rights signed by him in Garnishee's Exhibit 3. This direction and authorization was signed by Rodenkirk on May 20, 1942. The record clearly indicates that Attorney Green was acting for and on behalf of the defendant Rodenkirk in defending the personal injury action instituted by Deitenbach. Plaintiff's contention that garnishee is estopped from denying liability is not well taken for the additional reason that plaintiff failed to plead in his replication to the garnishee's answer the matter of estoppel. The reply merely alleged that the garnishee's answer had not truly discovered its indebtedness to the defendant, and that the automobile was not furnished for his regular use to the defendant or a member of his household and, therefore, plaintiff contended that the defendant was covered by the policy. There was no matter alleged in the reply filed by plaintiff that would indicate that the garnishee was estopped in any manner to raise the defense of noncoverage. Estoppel is an affirmative defense and must be pleaded. (Sec. 43 (4) Civil Practice Act, Ill. Rev. Stat. 1943, ch. 110, par. 167 [Jones Ill. Stats. Ann. 104.043, subpar. (4)].) The provisions of the Civil Practice Act apply to garnishment proceedings. (Ch. 62, par. 28, 1943 Ill. Rev. Stat.[Jones Ill. Stats. Ann. 109.311].)

Matters which must be affirmatively pleaded, such as estoppel, are waived when not alleged. The only issue presented before the trial court was whether or not the defendant had hired the automobile as a frequent use of hired automobiles, or whether the auto-

mobile was furnished for the regular use of the defendant or a member of his household. The question of estoppel was not pleaded, argued or ruled upon by the trial court. It now comes too late. A point or theory not put in issue or raised in the trial court may not be urged in a court of review. (*Consumers Petroleum Co. v. Flagler*, 310 Ill. App. 241; *People ex rel. Mitchell v. Engle*, 313 Ill. 483.) Aside from the question of the right of plaintiff to present the question of estoppel for the first time in a court of review, the evidence clearly shows that Attorney Green was acting for and on behalf of defendant Rodenkirk in his defense of the action brought by Deitenbach, and was not acting for and on behalf of the insurance company. The insurance company is therefore not estopped to deny liability under the policy in question.

In view of the evidence, plaintiff would not be entitled to recover against the garnishee, as the evidence shows that John Meyer had furnished to defendant Rodenkirk for his regular use the automobile owned by him. Where an automobile is furnished to the insured for his regular use there can be no recovery under the terms of the policy in question. The trial court found that Nondas Rodenkirk was a member of the household of Hilary Rodenkirk. As the evidence is conflicting in respect thereto, we feel that the finding of the court, who was in a much better position than we are to weigh the evidence, should not be disturbed. The findings of a trial court will be sustained unless wholly unsupported by the evidence. (*Winnetka Park Dist. v. Hopkins*, 371 Ill. 46; *Marine Trust Co. of Buffalo v. Reynolds*, 308 Ill. App. 595.)

For the reasons hereinabove given, we feel that the trial court, from the evidence in this case, was justified in discharging the garnishee.

The judgment of the superior court is therefore affirmed.

*Judgment affirmed.*

BURKE, P. J., and KILEY, J., concur.