91 So.2d 123 (1956)
Andrew L. LETEFF
v.
MARYLAND CASUALTY COMPANY et al.
No. 4307.
Court of Appeal of Louisiana, First Circuit.
November 26, 1956.
Rehearing Denied January 2, 1957.
Writ of Certiorari Denied February 25, 1957.
*124 Taylor, Porter, Brooks, Fuller & Phillips, Durrett & Hardin, Baton Rouge, for appellant.
H. Alva Brumfield, Weber & Weber, Baton Rouge, for appellee.
ELLIS, Judge.
In the early morning of August 31, 1953 plaintiff was the guest passenger in a Plymouth station wagon owned by the father of defendant Leslie W. Ventress, Jr., who was driving at the time of the accident. The plaintiff suffered serious permanent injuries which will render him an invalid for the balance of his life.
This case is before this court upon the exception of no right of action which had been sustained by the lower court after hearing testimony. We held in effect that the testimony heard went to the merits of the case and, therefore, reversed the ruling of the lower court and remanded the case for a full trial. Accordingly the case was tried before a Jury and judgment was rendered in favor of the plaintiff and against the insurer of the defendant, Maryland Casualty Company, for $10,000, the limit of its policy, and $50,000 additional and in excess of the policy against the defendant Leslie W. Ventress, Jr.
From this judgment defendant Maryland Casualty Company has appealed suspensively and defendant, Ventress, has appealed devolutively in forma pauperis. Plaintiff has answered the appeal asking that the judgment be increased to $250,000.
The negligence of Ventress, Jr. is not disputed. It is shown that he and the plaintiff were returning from a trip to the formers camp near Acey, La., between one and two a. m. and at the time the plaintiff was asleep on the back seat. Ventress, Jr. had no complete memory after the accident of things that happened three or four hours prior thereto and not until fifteen days after his return home from the hospital. There were no eyewitnesses to the accident, however, the plaintiff plead res ipsa loquitur and the testimony of Trooper Gomez is more than sufficient for a positive finding of *125 negligence on the part of Ventress, Jr. He testified:
"A. That morning at five minutes after two I received a radio call from Troop A, advising me that there was an accident just in front of the Casa Lobo Courts,I believe that's 61-65 just about three miles south of the circle, and wanted to find who I wanted to assign to check. Well, I was near Gonzales and I told them I would come up and check it, and when I got to the scene which was at 2:35, which was approximately a half hour after I received the call, when I got there some ambulance, who I found out later on was the Baton Rouge Ambulance Service, had already arrived at the scene and picked up the injured parties.
"Q. What did you find there; what did your investigation disclose? A. We found a 1951 Plymouth Concord Convertible, which is a station wagon, that had run off the road three hundred and ninety-three feet. It hit an embankment and flew through the air an additional thirty-one feet and hit an oak tree, overturned and traveled an additional ninety-one feet. In explaining that through the air business, what I based that on was after the car hit the embankment until it hit the tree there were no tire marks, no track marks, anything, and then from the tree on to where the station wagon was was just debris and pieces of the car, shoes and so forth.
"Q. How far did you say that the car traveled off the road itself? A. Three hundred ninety-three feet before it hit an embankment.
"Q. How did you determine that? A. I measured it with a hundred foot Lumfkin ruler.
"Q. You actually measured it rather than step it off? A. Yes, it's the practice on a bad accident to measure, not step off.
"Q. And what type of marks were these? A. It wasn't exactly a rolling mark. It was more so a side skid mark showing that apparently the driver of this vehicle had gotten off the road and was attempting to try to get back on and kept sliding. The grass was chewed out and it was as if it a digging like."
On the date of the accident Ventress, Jr., who was 22 years of age and single, was the owner of a 1950 Chevrolet ½ Ton pick up truck, which was insured in his name by Maryland Casualty Company with a limit of liability of $10,000 for injuries to any one person. The question in this case is whether the policy of the defendant Maryland Casualty Company covered Ventress, Jr. when driving his father's Plymouth.
The father of Ventress, Jr. was the owner of the 1951 Plymouth station wagon involved in the wreck which was insured in his name by Miller's Mutual Fire Insurance Company of Texas with a $10,000 liability limit for injuries to any one person. Millers Mutual paid its full limit of $2,000 under its medical payments coverage and also $10,000 under its bodily injury coverage for which it was given a release by the plaintiff but specifically all rights were reserved by plaintiff against Ventress, Jr. and Maryland Casualty Company.
With the above explanatory facts out of the way we now come to the meat in the coconut, viz., Maryland Casualty Company's defense to this case, which is a denial of any coverage under its policy. Maryland Casualty Company contends that as this policy was written to apply on Ventress, Jr.'s personally owned Chevrolet truck, that this coverage did not apply to the operation by Ventress, Jr. of his father's Plymouth station wagon because of a specific exclusion under the terms of its policy issued to Ventress, Jr. which specifically applied to the use of other automobiles by Ventress, Jr.
The policy language in question and which must be interpreted in arriving at a decision in this case is contained in "Insuring Agreement *126 V" on page 3 of the policy which insurance agreement and its exception, with unnecessary phraseology omitted, reads as follows:
"V. Use of Other AutomobilesIf the named insured is an individual who owns the automobile * * *, such insurance as is afforded by this policy for bodily injury liability, * * * with respect to said automobile applies with respect to any other automobile, subject to the following provisions: * * *.
"(b) This insuring agreement does not apply:
"(1) to any automobile owned by, hired as part of a frequent use of hired automobiles by, or furnished for regular use to the named insured or a member of his household * * *;"
As stated by counsel for Maryland Casualty Company in its brief:
"Quite obviously, if Ventress, Jr. was driving his father's automobile at the time of the accident, his insurance policy issued by the Maryland would not apply under the provisions of the above quoted Insuring Agreement V, as modified by the exceptions to the `Drive Other Cars Clause.'"
Counsel for plaintiff in his brief argues that
"One can read and re-read and then read again this conglomeration of suspended prepositions and no sensible meaning can be derived therefrom * * *.
"To begin with, the language `to any automobile' would exclude the very automobile that was being insured in the policy. Certainly the intention was not to insure an automobile and not insure it by this language, yet that is a reasonable interpretation."
It is further contended that the evidence clearly shows that the Plymouth automobile was not furnished for the regular use of Ventress, Jr. and that the latter did not have the use of his father's automobile except by obtaining express permission and he only used it on occasions. He also contends that the words "his household" are very ambiguous and uncertain in that one does not know whether such language means the named insured, Ventress, Jr.'s household or Ventress, Sr.'s household, and in conclusion argues that as the clause is "ambiguous, uncertain, confusing, subject to many interpretations and meaningless" that it must be given an interpretation most favorable to the insured in accordance with the jurisprudence. American Mfg. Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 203 La. 515, 14 So.2d 430; Stanley v. Cryer Drilling Co., 213 La. 980, 36 So.2d 9; Haeueser v. Aetna Casualty & Surety Co., La.App., 187 So. 684; Hartford Accident & Indemnity Co. v. Collins, 5 Cir., 96 F.2d 83, certiorari denied 305 U.S. 627, 59 S.Ct. 89, 83 L.Ed. 401. Succession of Cormier, La.App., 80 So.2d 571.
Counsel for plaintiff relies upon the case of Travelers Indemnity Co. v. Pray, 204 F.2d 821, Sixth Circuit Court of Appeal, which is very similar factually to the case under consideration and involved the interpretation of the same exclusion clause, and in that case the Court held that the clause did not afford a defense as it was of ambiguous meaning and, therefore, was interpreted against the insurance company and in favor of the insured. This case will be discussed in detail later in this opinion, for at this time we are merely stating the contentions of Maryland Casualty Company and of the plaintiff with regard to the above quoted language of the policy in question.
The facts briefly stated which are necessary to a decision of this case are that Ventress, Jr. was 22 years of age, employed at Cololymer Corporation for approximately two years as a laboratory technician prior to the time of the accident. At the time of the accident he lived with his parents at 4948 Dickens Drive, Baton Rouge, and was unmarried. He and his mother and father *127 had lived in this home for approximately a year and a half and although the legal title of the house at the time was in Ventress, Jr.'s name, this was done to obtain a longer term for the payments on the house.
On the date of the accident Ventress, Jr. owned a 1950 Chevrolet pick up truck and his father owned a 1951 Plymouth station wagon which Ventress, Jr. was driving at the time of the accident. Ventress, Jr. contributed to the house payments and household expenses but such contributions were not definite or fixed. Insofar as the use of the Plymouth station wagon was concerned, Ventress, Jr. did not have the right to use or drive it unless he first obtained permission from his father which he always did any time that he used it. The Plymouth station wagon was used primarily by his mother as his father rode back and forth to work with a neighbor. There were two sets of keys to this Plymouth station wagon, one of which Ventress, Jr. usually kept on his key ring and the other set which his mother usually kept on a table in the dining room. At the time of the accident in question Ventress, Jr. was using the Plymouth station wagon with his father's permission.
In order to assist this court on appeal we have a very sound written opinion by Judge Johnson who had this same question under consideration when he passed upon the exception of no right of action, and a very full and detailed brief tracing the history and holdings of former jurisprudence involving the interpretation of similar clauses, together with an accurate statement of the necessary facts upon which each decision was based, and we feel justified in taking the liberty of quoting the cases cited and facts as stated in counsel's brief.
Counsel for Maryland Casualty Company frankly states in his brief that "appellant certainly does not contend that the numerous authorities hereinabove discussed are factually decisive of the present case. Nevertheless, they do clearly show a long established and well recognized line of jurisprudence recognizing the intent, purpose and effect of the policy language in question and applying it according to such obvious meaning and intent." We fully agree with this statement. Before setting forth this line of jurisprudence, we are of the opinion that the facts in this case do not show that Ventress, Sr.'s Plymouth station wagon was furnished for regular use to the named insured within the ordinary meaning of the word "regular," and, therefore, if the Insuring Agreement does not apply it must be under one of the other clauses. See (b) (1) supra.
The Louisiana Supreme Court through Chief Justice Fournet, in dealing with the interpretation of language in an insurance policy in Hemel v. State Farm Mutual Automobile Insurance Co., 211 La. 95, 29 So.2d 483, 485, stated:
"`An insurance policy is a contract and the rules established for the construction of written instruments apply to contracts of insurance.' 14 R.C.L. 925, § 102. See also, Wallace v. Insurance Co., 4 La. 289; Parks v. Hall, 189 La. 849, 181 So. 191. Effect must be given to every part of the agreement if it is possible and while it is the universal rule of construction that all ambiguities must be construed in favor of the insured and against the insurer, when the intent of the parties is evidenced from the terms of the contract there is nothing for the court to construe and the policy must be given a reasonable interpretation consonant with the apparent object and plain intent of the parties. See, Muse v. Metropolitan Life Ins. Co., 193 La. 605, 192 So. 72, 125 A.L.R. 1075.
"These rules are sound and have for their foundation the pronouncements to be found in our Revised Civil Code. In Article 1945, to be found in Section 5 of Chapter 3 of Title IV under the heading `Of the Interpretation of Agreements,' it is provided that `courts are bound to give legal effect to all *128 * * * contracts according to the true intent of all of the parties,' and such `intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences.' In arriving at the intent of the parties, `All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act.' Article 1955. It is only when a clause is susceptible of two interpretations that it must be understood in the sense in which it may have some effect rather than in a sense that would render it nugatory (Article 1951) and only in doubtful cases that the agreement must be interpreted against the party who contracted the obligation. Article 1957."
* * * * * *
"Under the facts of this case the plaintiff's contention is untenable for as was very aptly pointed out by Chief Justice Hughes of the United States Supreme Court in the case of Williams v. Union Central Life Insurance Co., 291 U.S. 170, 54 S.Ct. 348, 352, 78 L.Ed. 711, 92 A.L.R. 693, `While it is highly important that ambiguous clauses should not be permitted to serve as traps for policyholders, it is equally important, to the insured as well as to the insurer, that the provisions of insurance policies which are clearly and definitely set forth in appropriate language, and upon which the calculations of the company are based, should be maintained unimpaired by loose and ill-considered interpretations.'"
It is admitted by counsel for all parties, both plaintiff and defendants, that there are no Louisiana decisions directly bearing on the proper interpretation and application of the exclusion heretofore quoted to the standard "Drive Other Cars Clause" in the policy issued by Maryland Casualty Company. It is therefore necessary that we look to the jurisprudence in other jurisdictions. As heretofore stated, we have been furnished an exhaustive brief by counsel for defendants containing a full and accurate citation and discussion of such cases and we quote:
"The cases listed below comprise the vast bulk of decisions throughout the United States which would shed any light on the problem at hand. They are discussed in chronological order with only one exception. The Court's attention is most particularly directed to the fact that appellant does not contend that all of the cases herein discussed are squarely in point so far as the exact phraseology or punctuation of the insurance clauses concerned, nor insofar as the exact same factual situation is concerned. All of these cases do, however, reflect the consistent interpretation of the same or similar language according to the plain meaning of the language. All save one indicate a clear understanding of the meaning and purpose of the insuring agreements, and none but one, which will be distinguished in some detail, find it necessary to hold the same or similar clauses to be possibly ambiguous. It is submitted that by following these cases in chronological order the clear line of judicial development of the meaning of the language here involved can be easily traced.
"One of the earliest and most often cited cases is Lumbermens Mutual Casualty Co. v. Pulsifer, D.C.Me.1941, 41 F.Supp. 249. Suit was brought by the insurance company carrying the coverage on the father's car, seeking to have it decreed that it was not responsible for coverage of the father with regard to an accident the father had while driving the son's car. The `drive other cars' coverage was provided by a special endorsement which included the exclusion of `any automobile (1) owned in full or in part by or registered in the name of the named insured or any member of the household thereof * * *' Other exclusions were likewise provided similar to those in the *129 more current policies, but are omitted here since unnecessary to a discussion of the Pulsifer case. The evidence introduced showed that the son was 25 years old, had a wife and child, and at the time of the accident was living with his wife and child in his father's house. The son had been employed in various cities and had recently obtained employment near his father's home, and temporarily while seeking a place to rent in the city where his new job was located continued to live in his father's house. It was likewise shown that the two families, i. e., the father and mother on the one hand, and the son and his wife and their child on the other, each occupied two bedrooms each in the family home, shared the kitchen and living room, split the household expenses and duties; the son and his wife brought their own furniture and their own car. The father and the son each drove his own car to his respective job each day, and the father had never driven the son's car before the occasion on which the accident occurred. Apparently, neither the father nor the son ever used the other's car without obtaining the other's consent.
"The defense raised by the insurer was, of course, that the `drive other cars' endorsement was inapplicable due to the fact that the automobile driven by its assured, the father, was owned by a member of the father's household. In dealing with the question, the court discussed the problem involved in the following language:
"`The interpretation and application of the language of the endorsement is facilitated by a consideration of its purpose.
"`1. The exclusion from coverage of other cars owned by the insured, as well as cars owned by members of his household, and the exclusion of cars "hired for regular use", as well as the language as a whole, would seem to indicate the intention of the Company to protect itself from a situation where an insured could pay for one policy and be covered by the insurance in driving any car that he decided to use, whether owned by him or members of his family or rented. In other words, cars under his control that he could use at will and might use often. Without some such exclusion it is obvious that the Company might lose premiums and also that the hazard under the insurance would be increased. That to avoid such results was apparently the idea of the agents of the company in writing this clause is admitted by its counsel.
"`The purpose on the part of the Company to extend the driver's regular insurance (without the payment of extra premium, as was the case here) only to casual driving of the other cars than his own, and to make inapplicable the insurance when driving cars usually at hand which he could take instead of his own, and which he would be likely to use often * * *' `make frequent use of', as the rider has itis inconsistent with the contention of the plaintiff here because it implies a closer and more permanent connection between the insured and the car, and more control over it than appears to be the fact in this case.
"`The clause in question seems to be one recently in vogue and I find no decisions precisely in point. Counsel have argued with much learning as to the meaning of the word "household". Ordinarily the word "household" is synonymous with "family", which Webster says is "The body of persons who live in one house and under one head or manager; a household, including parents, children and servants, and, as the case may be, lodgers or boarders." He defines "household" as "Those who dwell under the same roof and compose a family; a domestic establishment; family." Various definitions are given by Judge Savage in the *130 case of Robbins v. Bangor Railway & Electric Co., 100 Me. 496-506, 62 A. 136, 141, 1 L.R.A.,N.S., 963. Whether the term "household" or "family" is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a "collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness."'"
The Court then held that under the facts involved the son was not a member of the father's household, but that actually there were two families come together temporarily until the newcomer could find another place to live, which was expected to be accomplished in only a short time. Under the evidence, the Court held that each of the two families retained its own organization under its own head and did not merge into one family or household in such a way as the word "household" was used in the policy in question. Accordingly, the exclusion was held inapplicable and coverage was found in order.
Farm Bureau Mutual Automobile Ins. Co. v. Boecher, Ohio App.1942, 48 N.E.2d 895, 896. This case dealt with the "furnished for regular use" portion of the exclusion in the "drive other automobiles" endorsement of Boecher's policy. It was shown that Boecher was a used car salesman for a motor company which followed the practice of allowing its salesmen to take out any available used car for demonstration, attempted sale, inspection, etc., and in connection with such practice, the salesmen were permitted to use the cars and to drive them home at night. It was shown that Boecher drove one of the used cars home at night "quite often", but had never before driven the used car which he was driving at the time of the accident. The insurer contended that nevertheless, under the circumstances involved, any of the used cars were available for, and were in fact furnished for, regular use to Boecher, its assured (by a policy issued on Boecher's personal automobile). The Ohio Court of Appeal held that the insurance company's contention was well founded, that in fact the whole stock of used cars was in effect furnished for regular use to the used car salesman under the practice of the employing motor company, and that, therefore, the "drive other cars" coverage was inapplicable, as the used car he was driving at the time of the accident was "furnished for regular use" to him.
Rodenkirk, for Use of Deitenbach v. State Farm Mutual Auto Insurance Co., 1945, 325 Ill.App. 421, 60 N.E.2d 269, 274. In this case the Court found that there was no coverage extended under the "`drive other cars'" provisions of the plaintiff's policy inasmuch as the vehicle he was driving at the time of the accident was owned by his daughter's fiance, who had left the car with the plaintiff and his daughter when he went to the Service, and it appeared from the evidence that the owner of the car had advised the plaintiff and his daughter that they could use the car as they wished, and were asked to keep it in repair. It appeared that the car had been used to at least some extent by the plaintiff and by his daughter, the owner's fiance. The Court held that under the exclusions, there was no coverage inasmuch as the automobile in question had been furnished for regular use to the insured or a member of his household.
Island v. Firemen's Fund Indemnity Co., 1947, 30 Cal.2d 541, 184 P.2d 153, 154, 173 A.L.R. 896. Here the exclusion clause to the "drive other cars" provisions of the policy reads:
"`(a) To any automobile owned in full or in part by, registered in the name of, hired as part of a frequent use of hired automobiles by, or furnished for regular use to, the named insured or a member of his household * * *.'"
The opinion points out that the facts involved showed that the father was driving his son's automobile at the time of the accident. *131 The son had at that time been in the Armed Services about four months, and had left the car with his father prior to entry in the Service. Also immediately prior to his entry into the Service, the son and his wife had lived with the father for a brief period.
With regard to the defense of "furnished for regular use", the California Supreme Court held that under the conflicting evidence the instructions given to the jury by the trial judge were proper. With regard to the defense that the vehicle in question was owned by a member of the assured's household, the Court held that a grown son off in the Armed Forces was not a member of his father's household and points out that the term as used in the exclusion under consideration is an entirely different matter from the question of change of residence or domicile by entry into the Armed Forces.
Of particular interest is the Court's review and discussion of the meaning of the term "household" in the following language:
"One of the definitions of the word `household' given in Webster's New International Dictionary is, `Those who dwell under the same roof and compose a family; a domestic establishment.' The courts have noted that the term may have different meanings under different circumstances. Moore Shipbuilding Corporation v. Industrial Acc[ident] Comm., 185 Cal. 200, 207, 196 P. 257, 13 A.L.R. 676; Collins v. Northwest Casualty Co., 180 Wash. 347, 352, 39 P.2d 986, 97 A.L.R. 1235; Lumbermens Mutual Casualty Co. v. Pulsifer, D.C., 41 F.Supp. 249. In one of these cases it was said that the word `is variously used to designate people, generally, who live together in the same house, including the family, servants, and boarders; or it may be used as including only members of the family relation. It is probable that the two terms are coupled together in this statute to indicate that they are used synonymously, the "family" to include only those of the household who are thus intimately associated, the "household" to exclude those of the family not living in the home.' Moore Shipbuilding Corporation v. Industrial Acc[ident] Comm., supra, 185 Cal., at page 207, 196 P., at page 259, 13 A.L.R. 676. A federal court declared: "* * * Whether the term "household" or "family" is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a "collective body of persons living together, within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness."' In that case, it was held that when two families came together temporarily, `Each family retained its own organization under its own head and did not merge to make one family or one household in any such way as the word is used in the policy.' Lumbermens Mutual Casualty Co. v. Pulsifer, supra, D.C., 41 F.Supp. at pages 251, 252." [30 Cal.2d 541, 184 P.2d 156.]
Fleming v. Travelers Insurance Co., 1949, 206 Miss. 284, 39 So.2d 885, 886. Here the facts were somewhat unusual in that the insured driver under the defendant's policy was a husband who was living separate and apart from his legal wife, and had in fact, established a home with another woman, in another city. However, at the time of the particular accident in question, he was driving his legal wife's automobile. The defense was raised by the husband's insurer that the "drive other cars" provisions of its policy did not apply to use of the legal wife's car. The policy provision in question provided:
"`It is agreed that such insurance as is afforded by the policy for bodily injury, liability and property damage liability also applies: to the named insured * * * with respect to the *132 operation of any other private passenger automobile by any such insured * * * provided * * * (b) such use is with the permission of any person having the right to grant such permission; and (c) the automobile is not (1) owned in full or in part by or registered in the name of the named insured or any member of the named insured's household * * *.'"
In determining whether or not the above quoted exclusion applied, the Mississippi Supreme Court held that an abstract definition of the term "household" is valueless unless it be defined in accordance with the intent and purpose of the word as used in the particular matter under consideration. As regards the problem then involved, the Court stated:
"We are dealing with a contract of insurance. We must inquire what the parties thereto meant. Practical consideration must be given play, interpreted in the light of the purpose of the policy provision. This provision has been repeatedly held to reveal an obvious purpose to avoid a multiple coverage of several vehicles owned by members of the same family, who, by their close intimacy, may be expected to use the cars of each other without hindrance and without permission, thus increasing the liability of the insurer who has a right to expect each owner to contract for his own coverage. Concession is made to the casual permissive use by the insured of vehicles of other persons, whose permission may be considered episodic or not subject to abuse." (Emphasis added.)
Under all of the circumstances involved in the case, the Court went on to hold that the legal wife who was the owner of the car involved in the accident was not a member of the insured's household under all the facts and circumstances involved.
Northwest Casualty Co. v. Legg, 1949, 91 Cal.App.2d 19, 204 P.2d 106. In this case, the plaintiff insurer carried the liability coverage on a truck owned by the husband and his partner. The husband was involved in an accident while driving a Chevrolet passenger car owned by his wife's mother, and sought to have the insurance coverage on the partnership truck extended to cover his operation of his mother-in-law's passenger car. The evidence showed that the wife's mother was an invalid and lived in the same house with the husband and wife. After the mother became an invalid and unable to operate her car, the wife customarily used the car as her own, and it was also used from time to time by the husband. Based on the standard exclusions to the "drive other cars" provisions, coverage was denied, it appearing that for all practical purposes, the wife was the owner or equitable owner of the vehicle involved.
Davy v. Merchants Mutual Casualty Co., 1952, 97 N.H. 236, 85 A.2d 388, 389. The case arose out of the plaintiff's attempted recovery from the defendant as the individual insurer of a taxi driver after exhausting the limits of the taxi driver's employer's coverage on the taxi involved in an accident causing injury to the plaintiff. The taxi driver in question had an individual policy including the usual extended coverage with regard to the operation of other vehicles, subject to the usual exclusions. The evidence showed that the employer of the taxi driver owned two taxis and employed three drivers who drove the two taxi cabs interchangeably daily and on a full time basis. Although the principal defense was based upon a provision in the taxi driver's individual policy that it was inapplicable if there were any other valid and collectible insurance available to the insured against the particular lossthe Court also held that the taxi driver's individual coverage was inapplicable under the terms of Insurance Agreement V, since either or both of the taxi cabs driven by the driver were "`furnished for regular use to the named insured * * *'" within the meaning of the Insuring Agreement. In that connection, the Court cited the annotation on the subject at *133 173 A.L.R. 901. Following the case of Island v. Firemen's Fund Indemnity Co., discussed supra.
Vern v. Merchants Mutual Casualty Co., Sup.1953, 118 N.Y.S.2d 672. Here the Court applied the standard exclusion from "drive other cars" coverage with regard to frequent use of hired automobiles, and held that no coverage was afforded to a salesman who hired a car for three days use while out of town on a business trip.
Comunale v. Traders & General Ins. Co., 1953, 116 Cal.App.2d 198, 253 P.2d 495, 497. One Percy Sloan had a policy issued by the defendant insurance company on his Plymouth passenger automobile. Percy arranged with his brother John, who had a truck used in his laundry and cleaning business, for the use of the truck for Percy to drive to and from work when the truck was not in use by his brother. He agreed to pay to John what public transportation would have cost him, and did make one payment of $3 during the period of ten days during which John's truck was used by Percy to go to work. On the tenth day, Percy for the first time used the truck to pay a social visit to an aunt, and while on this mission, the accident in question occurred. The defendant insurer denied that its policy covered the operation of the truck by its assured, Percy Sloan. The "drive other cars" provision and the exceptions thereto were in the form generally in use. The Court of Appeal held that the insurer was bound in the appellate court by the interpretation pleaded by the insurer in the trial court that the term "frequent use" as used in exclusion clauses applies only to hired automobiles in connection with which it is used, and applies to a different situation than that covered by the clause "furnished for regular use", particularly since a hired automobile is always available for regular use and without some specific provision for hired automobiles, the "regular use" clause would normally exclude extension of coverage to any hired automobile. In the present case, since the automobile in question was a hired automobile, the particular clause dealing with hired automobilesfrequent useapplies rather than the regular use test applied generally to other automobiles. Under the facts of the case, there was question of fact to be decided by the trial court with regard to the question of frequent use, and its finding that such was not the case was supported by the evidence, since the truck was driven only approximately ten miles per day to and from work only, and for a period of ten days at the most. The Court also held that there was substantial evidence to support the trial court's finding of fact that the brother's truck had not been furnished to Percy for "regular use" under the general clause, since it had been used only specifically to drive to and from work and for a specific compensation, and had been used for no other purposes except on the one occasion on which the accident occurred. Therefore, Percy did not have the use of the truck for other purposes or regular use, and the exclusion did not apply.
Harrill v. Motor Vehicle Casualty Co., D.C.S.D.Iowa 1954, 122 F.Supp. 389, 391. The plaintiff Harrill claimed coverage by virtue of the Insuring Agreement V (the drive other cars provision) on a Buick convertible automobile he was driving at the time of an accident. There was some dispute in the evidence as to who the actual owner of the car was, there being some indication that the plaintiff himself was the owner. In any event, the evidence showed that Harrill had regularly used the Buick for several months before the accident. Insuring Agreement V had one of the commonly used forms of exception to it, reading:
"`This insuring agreement does not apply: (a) to any automobile owned in full or in part by, registered in the name of, hired as a part of a frequent use of hired automobiles by, or furnished for regular use to, the named insured or a member of his household *134 other than a private chauffeur or domestic servant of the named insured or spouse; * * *.'"
The Court held that regardless of the question of ownership, under the provisions of the exception the Buick automobile had been in regular use and operation by the plaintiff for some time prior to the accident and was therefore excluded from the extension of coverage by Insuring Agreement V. In discussing the general problem presented, the Court discusses the purpose and function of such exclusions in the following language:
"In other cases involving like policies with identical exclusionary clauses a distinction has been made between infrequent or merely casual use of an automobile other than that described in the policy and one which is frequently or regularly used by the insured. The record here shows without dispute that the Buick car, by whomever owned, was furnished for plaintiff's regular use and was so used. To hold otherwise than that the Buick was excluded from said coverage would in effect cause this court to include under the coverage of the policy issued to plaintiff another car for which no additional premium was paid with consequent increased and uncompensated risk of liability for the defendant. This court must take the contract as made between the parties and because of the regular use of the Buick automobile by plaintiff as opposed to a casual or infrequent use apparently contemplated so by the partiesthe exclusionary clause above referred to is brought into operation and applicable here. See in this connection: Aler v. Travelers Indemnity Co., D.C. Md.1950, 92 F.Supp. 620; Northwest Casualty Co. v. Legg, 91 Cal.App.2d 19, 204 P.2d 106; Rodenkirk, for use of Deitenbach v. State Farm Mut. Auto. Ins., Co., 1944, 325 Ill.App. 421, 60 N.E.2d 269; Farm Bureau Mut[ual] Auto[mobile] Ins. Co. v. Boecher, Ohio App.1942, 48 N.E.2d 895. See also Lumbermens Mut[ual] Casualty Co. v. Pulsifer, D.C.Me., 41 F.Supp. 249."
Farm Bureau Mutual Automobile Insurance Co. v. Marr, D.C.N.J.1955, 128 F. Supp. 67. The plaintiff insurance company brought a declaratory judgment suit to determine its liability under a policy issued to the defendant Marr on a Willys station wagon owned by the latter. The policy involved contained the usual insuring agreements, including that with regard to the use of other automobiles and the exceptions to it identical to that involved in the present case. Marr was the agent in charge of the Philadelphia office of the U. S. Customs Service, and while driving one of four Government owned cars assigned to his office while on Government business, he was involved in an accident causing death to a third party. Marr contends that the "drive other cars" clause of the policy issued to him on his personally owned car affords him protection for the subject accident while driving the Government car. The insurance company contended that its policy was not applicable since the Government automobile was a car furnished for regular use to Marr, which would, of course, exclude coverage to Marr while operating said vehicle. After reviewing a number of the previous decisions involving what constituted "regular use" within the meaning of the exclusion and automobile policies, the Court found that under the facts of the case the Government vehicle which Marr was driving, together with three other cars in a motor pool was available to Marr and others in his office at any time a vehicle was needed in their duties. The Court further found that Marr could and did use one of the cars in the motor pool fairly often and could use such cars any time he needed to without any particular permission, and further that the car was being used for the general purposes for which Marr had authority to use it and in the area where it would be expected to be so used. Therefore, the Court concluded that the Government vehicle was furnished *135 for regular use to Marr within the meaning of the exclusion to the "drive other cars" clause, and, therefore, the insurance policy in question did not afford him coverage.
Suttenfield v. Travelers Indemnity Co., D.C.E.D.Tex.1955, 133 F.Supp. 418, 422. Suttenfield and his employer, Columbus, Inc., both of Richmond, Virginia, brought suit against the defendant Travelers Indemnity Company on two different policies and against defendant Continental Casualty Company on one policy for payment made and expenses incurred by the plaintiffs in defending and in settling a substantial damage suit claim brought against them, which claim and suit both of the insurance companies had refused to defend and/or settle. The employer, Columbus, Inc., leased a car from an auto leasing corporation on an annual basis for the full regular use of Suttenfield in Richmond. Travelers Indemnity Company had in force a policy on such leased car with the leasing corporation which owned the car, the employer Columbus, Inc. and Suttenfield all being named as assureds. In addition, Suttenfield had a personally owned private automobile also insured by Travelers in standard policy form. As Suttenfield traveled a good bit in the course of his duties, he was authorized by Columbus, Inc. to rent a car whenever his duties made it necessary. While on a business trip to Dallas, Texas, Suttenfield rented a car from the Hertz Car Rental System to drive to Waco, Texas on business. While on this trip a serious accident occurred. The evidence showed that within the year preceding the subject accident, Suttenfield had on some seven different occasions rented cars while on out of town business trips. Defendant Continental Casualty Company had an automobile liability policy on the Hertz rental car, which provided that it insured the renter (driver) of the car and the employer of such renter, but that such insurance would be applicable only if any loss in question was not covered by any other insurance. After the occurrence of the subject accident, Continental, the insurer of the Hertz car, claimed that as the Travelers' policies on the car leased for Suttenfield's regular use, and on Suttenfield's personal car did not apply and protect Suttenfield while driving the Hertz car, its policy was therefore inapplicable. On the other hand, Travelers denied that either of its policies applied.
Both of the Travelers' policies had the standard "drive other cars" clause as Insuring Agreement V.
As regards the Travelers' policy on the annually leased automobile assigned to Suttenfield, the Court held that it was obviously inapplicable since the "drive other cars" clause by its terms applies only "if the named assured is an individual who owns the automobile * * *." Since the owner of such car was an automobile leasing corporation and not an individual, Insuring Agreement V could not apply under that policy.
With regard to the Travelers' policy on Suttenfield's personal car, one of the clauses in the exclusions listed in Insuring Agreement V(b) (1) provided that the "drive other cars" clause would be inapplicable to any automobile hired as part of a frequent use of hired automobiles by the named insured. The Court held that unless the regular use of the annually leased car assigned to Suttenfield could come under this exclusion, the seven occasional hirings of cars by Suttenfield while on out of town business trips would probably be insufficient to constitute frequent use of hired automobiles within the meaning of the policy. In this connection, the Court then went on to say:
"It is the well-settled rule that parties are at liberty to make such contracts of insurance as they please provided such contracts do not contain clauses prohibited by law or public policy. In construing a contract of insurance, the intention of the parties is of primary and controlling importance and when the contract is unambiguous this intention must be determined from the instrument *136 itself considering all its parts and their proper bearing. When the intent of the parties in the use of the language of the contract is obvious and unmistakable, the courts must enforce the contract which is written and cannot give it an opposite meaning under any theory of ambiguity.

"When Insuring Agreement V of the Travelers' policies is considered with the provisions of the policy as a whole and in light of the known and recognized purposes of automobile liability insurance, it is clear and obvious that the `use of other automobiles' coverage extended by said Insuring Agreement V was intended to be limited coverage and that such coverage was not to extend to the insured when using a hired automobile if the insured used hired automobiles frequently. It is the frequent use of hired automobiles by the insured at which the exclusionary provisions of Sec. (b) (1) of Insuring Agreement V are directed rather than the frequent hiring of automobiles. That being true, the use of Suttenfield of the [leased] automobile must be considered as a use by Suttenfield of a hired automobile within the meaning of Sec. (b) (1) of Insuring Agreement V and when that is done, Suttenfield was using the Hertz automobile at the time of the collision in question as part of a frequent use of hired automobiles. Therefore, the coverage of the Travelers' policy covering Suttenfield's Studebaker automobile did not extend to the Plaintiffs, or either of them, as to the Hoppe collision and the claims of Hoppe resulting therefrom." (Emphasis added.)
Note that the Court here construed and applied as written the second and longest of the three phrases contained in the exclusion paragraph here involved. The Texas court found the meaning and intent of the language obvious and unmistakable and therefore enforced it as written.
Fidelity & Casualty Co. of New York v. Johnson, D.C.Minn.1955, 134 F.Supp. 156. Suit for declaratory judgment by the insurer to determine its liability under a policy issued to Charlie Johnson on a Kaiser automobile owned by him. The policy had the same Insuring Agreement V with the same exclusion clauses as is involved in the present case. The accident in question occurred when Charlie Johnson's wife was driving a Ford automobile formerly owned by Charlie Johnson, but "sold" or at least transferred to their son, Alvin Johnson, at the time the insured Kaiser automobile was purchased. The evidence indicated that the Ford had been sold to the son, Alvin, for a very nominal price, with the apparent understanding that the parents, Charlie Johnson and his wife, would continue to use the Ford with Alvin. Although the Ford was used almost exclusively by Alvin for his business purposes during the winter, it appeared that the Ford was kept on the father's farm much of the time, especially during the seeding season in the Spring. Apparently, the Ford was also used by the father and the wife during such time in about the same manner as they had used the Ford before it was sold to the son, Alvin. In fact, the Ford was the only car the wife used since she did not know how to drive the more recently acquired Kaiser automobile.
Under all of the facts, the Court found that the Ford was "furnished for regular use" to the insured, Charlie Johnson and/or his wife, within the meaning of the exclusion in the insurance policy. Therefore, the policy was not applicable and judgment was rendered for the plaintiff.
"Probably the leading case on the particular narrow problem here involved, and the case most frequently cited, is Aler v. Travelers Indemnity Co., D.C.Md.1950, 92 F.Supp. 620. Briefly, the facts there involved are as follows. Aler lived with his wife and 22 year old son, and with his wife's widowed mother, who came to live with *137 him following the death of her husband. The mother-in-law brought with her when she moved to Aler's house her Plymouth automobile, which was kept at Aler's house and was used by various members of the family. The mother-in-law was well over 70 years of age and seldom if ever drove her car herself. Apparently, the plaintiff Aler did not drive his mother-in-law's Plymouth very much, but upon one occasion while doing so was involved in an accident. Upon the insurer's denial of coverage under the policy issued to him on his own personal automobile, he brought suit for declaratory judgment. Judge Chestnut held that under the facts, the operation of the mother-in-law's vehicle by Aler was not covered since it was owned by a member of his household, and also since it appeared from the facts that the vehicle was furnished for regular use to the named insured or members of his household.
"Although it is most difficult to pick out particular portions of this very able opinion which are more important than others, the following indicate the judge's analysis of the issues involved and his interpretations reached:
"`The principal coverage of the policy is, of course, to indemnify the insured against personal liability for injuries caused by his own use of the described automobile but under the printed conditions of the policy (in a standard form now in general use for some years past) the insured is likewise to be indemnified against liability incurred by the use of his automobile by other persons, and, more importantly for this case, by his own use of automobiles other than the one described in the policy; but with certain exceptions or limitations on this latter expanded coverage which is provided for in Article V of the insuring agreements. The first paragraph of this article V provides, as applicable to the present case, that the insured is likewise to be indemnified for personal liability, by his use of `any other automobile, subject to the following provisions * * *
"`(b) This insuring agreement does not apply: (1) to any automobile owned by, hired as part of a frequent use of hired automobiles by, or furnished for regular use to the named insured or a member of his household other than a private chauffeur or domestic servant of the named insured or spouse;'. The decision in this case turns upon the construction and proper application of this excepting clause to the facts of the case which follow." (Note that the exclusion clause is identical with the exclusion clause in the Maryland policy involved in the present case).
* * * * * *
"`This case involves the construction and application of the so-called "drive other automobiles" clause of the present standard automobile liability policy. The general purpose and effect of this provision of the policy is to give coverage to the insured while engaged in the only infrequent or merely casual use of an automobile other than the one described in the policy, but not to cover him against personal liability with respect to his use of another automobile which he frequently uses or has the opportunity to do so. More specifically the evident intention of the limitation with respect to other automobiles is to prevent a situation in which the members of one family or household may have two or more automobiles actually or potentially used interchangeably but with only one particular automobile insured. That this is the general purpose of the provision is well and clearly stated in the annotation of the subject in 173 A.L.R. 901. And see Lumbermens Mutual Cas[ualty] Co. v. Pulsifer, D.C.Me., 41 F.Supp. 249;

*138 Rodenkirk [for use of Deitenbach] v. State Farm Mut. Auto. Ins. Co., 325 Ill.App. 421, 60 N.E.2d 269.
* * * * * *
"`Beyond this, both the grammatical construction and the obvious purpose of the excepting clause is to include as an exception to liability the use by the insured of an automobile owned by a member of his household. While the quoted clause is not ambiguous in meaning, it does require careful and close reading to gather its whole meaning. This is apparently due to a revision and condensation of the phraseology used, for brevity. And this will I think appear when the present phraseology of the condition is compared with other or earlier forms of the same subject matter to be found in the wording of the condition appearing in Lumbermens Mut[ual] Cas[ualty] Co. v. Pulsifer, D.C.Me.1941, 41 F.Supp. 249; Island v. Fireman's Fund Indemn. Co., 1947, 30 Cal.2d 541, 184 P.2d 153, 173 A.L.R. 896; Fleming v. Travelers Ins. Co., 206 Miss. 284, 39 So.2d 885; Pacific Auto[mobile] Ins. Co. v. Lewis, 56 Cal.App.2d 597, 132 P.2d 846. Thus, on close reading of the excepting clause (eliminating wording not applicable in this case) excludes from coverage the use of any other automobile (1) owned by the insured or a member of his household, or (2) furnished for regular use to the insured or a member of his household. Rodenkirk [for Use of Deitenbach] v. State Farm Mut. Auto. Ins. Co., 325 Ill.App. 421, 60 N.E.2d 269.
"`3. It is quite clear on the facts found in this case that Mrs. Sharp, the mother-in-law, and the owner of the Plymouth Automobile involved, was a member of the plaintiff's household. State Farm Mut. Auto[mobile] Ins. Co. v. James, 4 Cir., 80 F.2d 802; Rydstrom v. Queen Ins. Co., 137 Md. 349, 112 A. 586, 14 A.L.R. 212; Farm Bureau [Mut.] Auto[mobile] Ins. Co. v. Violano, 2 Cir., 123 F.2d 692; Ocean Acc[ident] & Guar[anty] Co. v. Schmidt, 6 Cir., 46 F.2d 269; Arthur v. Morgan, 112 U.S. 495, 5 S.Ct. 241, 28 L.Ed. 825.'
"It is submitted that the exact language (including punctuation) so ably interpreted and explained in the Aler case clearly and forcefully requires the application of the same rule to the facts involved in the present case. Certainly the facts here involved make it amply clear that (1) the Plymouth automobile driven by Ventress, Jr. at the time of the accident was owned by his father, (2) Ventress, Jr. and Ventress, Sr. were certainly members of the same household, and (3) the said Plymouth was very obviously furnished for regular use by at least other members of Ventress, Jr.'s household, particularly his mother and father, if not by Ventress, Jr. himself. These factors compel the conclusion that the present case is exactly that type for which the exceptions to the `drive other automobiles' provisions were designed."
In the case of Travelers Indemnity Co. v. Pray, supra, relied upon by the plaintiff, the Court held that the exception clause in the policy was ambiguous. This clause is the same as the one under consideration. It was held that in the case of ambiguity in insurance policies it must be construed against the insurer and in favor of the insured, and squarely took issue with the opinion in the Aler case in which it was stated that the exception clause excluded from coverage any other automobile owned by the insured or member of his household or furnished for regular use to the insured or member of his household. In arriving at the above conclusion, the majority held:
"In order to make a complete sentence of the questioned provision, grammatical construction would seem to require that the three phrases (1) `to any automobile owned by,' (2) `hired as a part of a frequent use of *139 hired automobiles by,' and (3) `or furnished for regular use to', have as their object the words `the named insured or a member of his household' etc. Without inserting a comma (which is not to be found in the policy) before the words `the named insured,' the provision cannot be so construed; for unless the comma be inserted as specified, the first two of the three aforementioned phrases are left dangling without an object.
"Moreover, it appears that the policy intended to tie together indissolubly the words in the phrase `or furnished for regular use to the named insured or a member of his household'; and, to that end, the comma was not inadvertently, but deliberately, omitted. If this be true, in order to bring any automobile owned by a member of the insured's household within the exception would require the omission of the word `or.' But, if the word `or' should be omitted, the sentence read in entirety would not be good English, nor would it make good sense. Although punctuation is not to be permitted to control meaning where the text is clear, it may become, in case of ambiguity, the controlling guide to proper interpretation."
The minority opinion in the Pray case agreed with the reasoning and interpretation as shown by prior jurisprudence and held that under the terms of the policy in question, the driver of the "drive other cars" insuring agreement did not apply to any automobile owned by the named insured or member of his household.
The Fourth Federal Circuit Court of Appeal in Campbell v. Aetna Casualty & Surety Co., 4 Cir., 1954, 211 F.2d 732, 736, in which the facts and particular portion of the exclusions are indistinguishable from the present case, stated:
"The great weight of authority is in accord with the interpretation of this provision by Judge Chestnut in Aler v. Travelers Indemnity Co., D.C.Md., 92 F.Supp. 620, 623, where he said:
"`This case involved the construction and application of the so-called "drive other automobiles" clause of the present standard automobile liability policy. The general purpose and effect of this provision of the policy is to give coverage to the insured while engaged in the only infrequent or merely casual use of an automobile other than the one described in the policy, but not to cover him against personal liability with respect to his use of another automobile which he frequently uses or has the opportunity to do so. More specifically the evident intention of the limitation with respect to other automobiles is to prevent a situation in which the members of one family or household may have two or more automobiles actually or potentially used interchangeably but with only one particular automobile insured. That this is the general purpose of the provision is well and clearly [sic] stated in the annotation on the subject in 173 A.L.R. 901. And see Lumbermens Mutual Cas[ualty] Co. v. Pulsifer, D.C.Me., 41 F.Supp. 249; Rodenkirk [for Use of Deitenbach] v. State Farm Mut. Auto. Ins. Co., 325 Ill.App. 421, 60 N.E. 269.'
"See also, Farm Bureau Mut[ual] Auto. Ins. Co. v. Boecher, Ohio App., 48 N.E.2d 895; Island v. Fireman's Fund Ind. Co., 30 Cal.2d 541, 184 P.2d 153, 173 A.L.R. 896; Northwest Cas[ualty] Co. v. Legg, 91 Cal.App.2d 19, 204 P.2d 106; Vern v. Merchants Mut. Cas. Co., Sup., 118 N.Y.S.2d 672; Fleckenstein v. Citizens' Mutual Automobile Ins. Co., 326 Mich. 591, 40 N.W. 2d 733; cf. Travelers Indemnity Co. v. Pray, 6 Cir., 204 F.2d 821."
Bearing in mind the established rules of interpretation and the reason for such exclusion clauses as shown in the cited *140 jurisprudence, we believe that the interpretation placed upon the exclusion clause by the majority in the Pray case not only stands alone but is in error. The great weight of authority is contra.
Two doctors of English, now teaching in the Department of English, at Louisiana State University, testified as experts as to their interpretation of the meaning of the exclusion clause in question. Dr. Nathaniel M. Chaffee testified on behalf of defendants as follows:
"Q. With particular reference to the punctuation, Dr. Chaffee, in that little subparagraph `(1)' about `any automobile owned by' and so on, would you state what kind of construction that is. What do you call these little group of things that appear in there? A. This is what you call a series.
"Q. A series? A. A series of modifiers, or a series in this case, prepositional phrases, which happen not to be complete until you get to the end, that is, you have `owned by', you have a preposition there, `hired by', that's a preposition, and then `furnished for regular use to',and `to' is another preposition. They all take as their object `the named insured', and so on, so you have a series, but it is really called a suspended prepositional construction.
"Mr. Hardin: Just a minute.
"Mr. Middleton: Would you like to have Dr. Chaffee repeat that?
"Mr. Hardin: Yes. `a suspended prepositional' what? A. A suspended prepositional construction, that is you have a series of phrases ending in a preposition and each preposition takes the same noun which follows all of them finally.
"Q. What noun or nouns, according to the strictly grammatical approach, are the object to those prepositional phrases? A. `The named insured or a member of his household' and so on, but the `named insured' is an object of the three prepositions `by' after `owned', the other `by' after `automobile' and `to' after `use'.
"Q. As that thing is punctuated that way, Dr. Chaffee, that is with these commas after the first two of these prepositional phrases, what is the function or meaning, purely from a grammarian's point of view, of those commas? A. When you have a series separated by commas they are coordinate or equal value in rank. In order to have a series in grammar you have to have three or more things modifying something else or naming something else, whether they be words, phrases or clauses.
"By The Court: Q. Give the jury your interpretation of what that thing means. A. In this case each one of these phrases which precedes the comma is in effect an exception, because the `b' in parenthesis, `This insuring agreement does not apply:', which in effect is beginning to name some exceptions to the application and then there are here really three exceptions which are named.
"Q. What are those exceptions? A. Those exceptions here are first an `automobile owned by the named insured or a member of his household' and so on. Another one is `Any automobile hired as part of a frequent use of hired automobiles by the named insured or a member of his household' and so on, and the third exception is `does not apply to any automobile furnished for regular use to the named insured or a member of his household', and so on.
"By Mr. Middleton: Q. Dr. Chaffee, you have just in explaining that in answer to the Judge's question you have repeated each time the language `the named insured or a member of his household'. I gather then that as *141 you said earlier each of these exceptions or conditions, that is, `owned by,' `hired by' or `furnished to', and so on, each have as their object `the named insured or a member of his household'? A. That's right, certainly.
"Q. To the same effect as if they had been repeated each time as you gave them? A. Yes."
* * * * * *
"By The Court: Q. You don't consider it ambiguous as it is written? A. No, sir, I don't. With a comma after the `to' it might be ambiguous because then the phrase `or furnished for regular use to' by punctuation, though certainly not by meaning, ought to be in apposition, that is, mean the same thing as the thing which has just preceded it.
"By Mr. Middleton: Q. Give us an example. A. I will give you an example. If you said, `this is an eleemosynary comma or charitable comma institution', then the `or charitable' is the same thing as `eleemosynary', that is, is in apposition to eleemosynary, but, of course, also eleemosynary means the same thing as charitable in terms of meaning, and the grammar indicated by the punctuation simply shows that they do have the same meaning, but in this instance the meaning is different, that is in this phrase here.
"Q. In the insurance policy? A. In the insurance policy.
"Q. Is there any particular rule of grammar, particularly well known rule of grammar, that you believe in your expert opinion would be applicable to the use of commas in punctuating these particular phrases and clauses in this little (1) in parenthesis section we are talking about? A. It comes under two rules that are very common. They are stated in all grammars and handbooks. The first one is in all grammars and handbooks, and that is for punctuation of a series commas are inserted between the members of the series but are not put before the first member or after the last member, and then the second rule which is not usually found in most college textbooks because it is supposed to have been learned further down in the public schools, is a very general rule that main elements of any construction sentence, such as as a noun and verb, subject and verb, or a preposition and its object are never separated by commas. Now, in this case, of course, you don't have the preposition `to' separated from its object. The commas which come after `by', the first `by' and the second `by' are necessary because they are parts of a series.
"Q. You gave us an example a while ago, Dr. Chaffee, of an instance where you set off or separated all of the items because they mean the same thing, like the charitable and eleemosynary institution. Can you give us an example akin to the type construction you say is present here where different items in series are not identical or exactly synonomous or where the operation of separation of items in a series is affected by commas? A. Of course, there is such a thing as a simple series, `a red, white, and blue flag' where you put a comma after red, and a comma after white, but you never put a comma after blue because that's the same idea actually, or you might, another instancelet's say a little more complicated perhaps. I don't guarantee the sense of this, `I heard of, drove to, and looked at the monument.' I would never put a comma after `at' any more than I would put a comma after `blue' in `red, white, and blue flag.'
"Q. These examples you have given are in your opinion the same type of comma and modifier construction as is present in the particular clause in the insurance policy we are talking about? A. Certainly."
*142 Dr. John Earl Uhler testified as an expert on behalf of the plaintiff and after much questioning and explanation by the attorneys was asked: "Looking at it now, is it not possible for you to determine the intended meaning, whether you consider same poorly worded or obscure or not? Is it not possible for you to determine the intended meaning of that paragraph?" and he answered: "Well, I would say no unless the writer himself would explain the sentence to me and say he means this, and if he would say that then I would rewrite the sentence and ask him then, `Did you mean to say this?'"
However, under cross examination he did state after explanation by counsel of what he thought the exclusion clause plainly meant, that he could see that the object of all the prepositions is meant to be the words "the insured", although he stated "At the beginning I wouldn't have seen that." In another portion of his cross examination he gave the following testimony:
"Q. `This insuring agreement does not apply: (1) to any automobile owned by',by whom? What does the clause say is excluded by virtue of ownership?
"A. You have mentioned the named insured or member of his household. That's all right."
Dr. Chaffee's interpretation is in accord with our idea of the meaning as well as the interpretation given by cited jurisprudence, with the exception of the Pray case, supra.
Judge Johnson in his written reasons on the trial of the exception in the court below in discussing the Pray case had the following to say:
"Try as hard as I may I cannot bring myself in agreement with that decision. The language of the exclusion is not ambiguous. It is somewhat cumbersomely written and must be read with close scrutiny in order to grasp its full meaning, but there is nothing wrong with its grammatical construction. There is a well known rule of grammar which says that if it can be avoided verbs and prepositions are not separated from their object or objects by punctuation. The exception to that rule is where a parenthetical or explanatory phrase is thrown in after the preposition and before its object, then such phrase for clarity must be set apart by commas. There is another rule that a series of words or phrases are separated by commas, except there should be no comma before the first nor after the last of the series. In the provision here under consideration the qualifying phrase `the named insured or a member of his household * * *.' is the object to the first preposition `by'. It is the object of the second preposition `by' and it is the object of the preposition `to'. It would be wholly improper to separate with the comma the preposition `to' from its object `The named insured or a member of his household * * *'. I consulted two works which are used or have been used as text books at the Louisiana State University in the English courses. `Writing and Thinking' (1941) is a handbook authored by Norman Forester, Director of the School of Letters, at the State University of Iowa, and J. M. Steadman, Jr., Professor of English at Emory University. Rule 18c of that book at page 170 reads thus: `Do not use a comma before the first or after the last of a series.' `Harbrace College Handbook' by Hodges of the University of Tennessee at page 129 gives the rule as follows: `13dDo not put a comma before the first item of a series, after the last item of a series or after a conjunction.'"
Also see American Mutual Liability Ins. Co. of Boston v. Meyer, 3 Cir., 1940, 115 F.2d 807.
*143 Counsel for plaintiff had one other contention which has not been fully discussed as yet, viz., that the language "member of his household" refers only to the household of which the named assured is the head and master, or it could be reasonably given such an interpretation. We agree with the interpretation of this phrase as given by Judge Johnson in the following language:
"I think the word `household' is synonymous with the word `home' and the word `family'. It is true that Ventress, Jr. is not the head of the household, or the home or the family. Nevertheless, it is Ventress Jr.'s `home', it is his `family' and it is his `household'. He doesn't own it in the sense that he owns the truck, but he belongs to it and it belongs to him."
The meaning of the word "household" was also discussed in the case of Tomlyanovich v. Tomlyanovich, 239 Minn. 250, 58 N.W.2d 855, 859, wherein the Court stated:
"Plaintiff contends that the words `family of the insured' includes only those members of the group of which the insured is the head. In Farm Bureau Mutual Automobile Ins. Co. v. Violano, 2 Cir., 123 F.2d 692, 695, the same argument was made respecting the construction of the words `any member of his (the insured's) household.' In rejecting this argument, the court said:
"`* * * Farm Bureau argues that "his household" must be taken to mean `a household of which he is the head.' We cannot accept that construction. In normal speech one's household is the familial or residential group with which one lives; a wife or child, as well as the pater familias, has a household. The purpose of excepting cars owned by members of J. Alan's household was to reduce insurer's risk; words having a similar purpose were given their ordinary meaning in Cartier v. Cartier, 84 N.H. 526, 153 A. 6, and in Home Insurance Co. v. Pettit, 225 Ala. 487, 143 So. 839. This interpretation is clinched by the fact that the coverage of Auto 1-S was available to J. Alan only if he resided in his father's household.' [Italics by the court.]
"The facts in Cartier v. Lumbermen's Mutual Casualty Co., 84 N.H. 526, 153 A. 6, are nearly identical with those in the case before us, except that the policy excluded `accidents to members of assured's household, including domestic or household servants.' In that case, as here, plaintiff, his brother who was the insured, their father, mother, and sister all lived together in a house owned by the mother, who ran it and to whom the brothers and father each paid board. It was argued that the excepting clause in the policy did not exclude a brother of the insured but only a household of which the insured was the head. In rejecting this contention, the New Hampshire court said, 84 N.H. 527, 153 A. 6:
"`A household is a group of persons living together. It is usually said that they must be under a head called the householder. Of the household here apparently the mother was the head. The insured and his brother being members of it, it was their household or the household of each of them. * * * The clause would not seem to be doubtful in a disclosed purpose to make membership in a household on the part of the insured enough to subject him to it. It is the natural and ordinary meaning of the words used. As one reads the clause, the policy gives the insured no protection for injury to members of his household, and the household includes any servants in it. * * *'"
See also Ocean Accident & Guaranty Co. v. Schmidt, 6 Cir., 46 F.2d 269; Home Insurance Co. v. Pettit, 1932, 225 Ala. 487, *144 143 So. 839; Neidhoefer v. Automobile Ins. Co., 7 Cir., 1950, 182 F.2d 269; Hartford Accident & Indemnity Co. v. Casualty Underwriters, D.C.Minn.1955, 130 F.Supp. 56. Island v. Firemen's Fund Indemnity Co., supra, Lumbermens Mutual Casualty Co. v. Pulsifer, supra.
We find no merit in plaintiff's contentions and agree with the defendant that under the exclusion clause the insurance policy did not apply to any other automobile owned by the named insured or a member of his household, nor to any automobile hired as being a frequent use of hired automobiles by the named insured, or a member of his household or to any automobile furnished for regular use to the named insured or a member of his household.
Therefore, under the facts of this case, the Plymouth station wagon was owned by a member of Ventress, Jr.'s household, viz., his father, and furnished for regular use to a member of his household, viz., his mother, which clearly excluded any coverage under the policy of the defendant, Maryland Casualty Company to the defendant Ventress, Jr. while operating the Plymouth station wagon.
There is one other question which counsel for defendant Ventress, Jr. has raised in argument and brief, viz., that should this court reverse the judgment of the Jury and Lower Court, then the judgment as to Ventress, Jr. should be reversed in its entirety and that no award whatever be made against Ventress, Jr. due to his inability to pay even the most moderate of awards. The facts do reveal that Ventress, Jr. cannot respond to any judgment and as stated by counsel in his brief would probably be forced to go into bankruptcy should this judgment stand against him.
However, his negligence was the sole and proximate cause of the injuries and for that reason this court cannot and will not reverse the judgment as to him in its entirety. While the court realizes that he cannot respond to a judgment in the amount awarded, the record reveals that he and the plaintiff are still close personal friends and therefore plaintiff has a more accurate knowledge of Ventress, Jr.'s financial responsibility than this court from the record. To reduce this judgment would in no wise secure or guarantee the payment even of a lesser award.
For these reasons we will allow the judgment to stand in the amount as rendered against the defendant, Leslie W. Ventress, Jr.
For the above and foregoing reasons, the judgment of the District Court in favor of the plaintiff and against Leslie W. Ventress, Jr. is hereby affirmed, and the judgment of the plaintiff against the defendant, Maryland Casualty Company, is hereby annulled and reversed and plaintiff's suit as against Maryland Casualty Company is dismissed.